# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-1046 and 03-1179

_____

Dakota, Minnesota & Eastern Railroad   *
Corporation,                       *
                                    *
      Plaintiff - Appellee/        *
      Cross Appellant,          *   Appeals from the United States
                                    *   District Court for the
      v.                             *   District of South Dakota.
                                    *
State of South Dakota, et al.,      *
                                    *
      Defendants - Appellants/   *
      Cross Appellees.         *

_____

Submitted: October 23, 2003

Filed: March 23, 2004

_____

Before LOKEN, Chief Judge, LAY and BOWMAN, Circuit Judges.

_____

LOKEN, Chief Judge.

In 1986, the Dakota, Minnesota, & Eastern Railroad (DM&E) purchased the deteriorated interstate rail system of the Chicago & North Western Railroad. In 1998, seeking new revenues to fund needed repairs, DM&E applied to the federal Surface Transportation Board for authority under 49 U.S.C. § 10901 to construct new rail lines and to rebuild existing track in South Dakota and elsewhere in order to access low sulfur coal mined in the Powder River Basin area of Wyoming. South Dakota

then substantially amended its statute delegating the State's eminent domain power to railroads so as to place onerous new restrictions on railroads seeking to exercise that power. 1999 S.D. Laws ch. 222, §§ 4-7 (collectively, "Chapter 222"). DM&E responded by commencing this action against the State, its Governor, and the South Dakota Transportation Commission to enjoin the enforcement of Chapter 222 as contrary to federal law.

After a bench trial, the district court granted permanent injunctive relief, enjoining the State[1] from enforcing four provisions of Chapter 222. The court declined to enjoin enforcement of a fifth provision, concluding that it is severable from the invalid provisions. Dakota, Minn., & E. R.R. v. South Dakota, 236 F. Supp. 2d 989 (D.S.D. 2002). Both parties appeal. Neither challenges the district court's detailed analysis of the extent to which the five provisions conflict with federal law. Rather, the Governor argues that the court's injunction violates the State's Eleventh Amendment immunity and the Tenth Amendment, while DM&E cross-appeals the district court's severability ruling. Reviewing these issues of law *de novo*, we vacate one aspect of the injunction because of uncertainty as to the court's subject matter jurisdiction, modify the remainder in accordance with footnote 1, and affirm.

## I. Background.

Prior to 1999, the South Dakota eminent domain statutes provided that "[a] railroad may exercise the right of eminent domain in acquiring right-of-way as provided by statute." S.D. CODIFIED LAWS § 49-16A-75 (1993). Chapter 222 amended § 49-16A-75 by adding the proviso, "but only upon obtaining authority from the Governor or . . . the commission, based upon a determination by the Governor or

---

[1]After dismissing claims against the State and the Transportation Commission as barred by the Eleventh Amendment, the district court granted injunctive relief against "the State of South Dakota." We modify the injunction to restrain only "the Governor of the State of South Dakota."

the commission that the railroad's exercise of the right of eminent domain would be for a public use consistent with public necessity." Chapter 222 went on to grant the commission rulemaking power and to place the burden of proving "public use consistent with public necessity" on the applicant railroad. See S.D. CODIFIED LAWS §§ 49-16A-75.1 and -75.2 (2003). Then, in a provision now codified at § 49-16A-75.3, Chapter 222 specified criteria to be used by the Governor and the Commission in determining public use consistent with public necessity:

> A railroad's exercise of the right of eminent domain is a public use consistent with public necessity only if the use of eminent domain:
>
> (1) Has as its purpose providing railroad transportation to shippers in South Dakota, for commodities produced, manufactured, mined, grown, used, or consumed in South Dakota;
>
> (2) Is proposed by an applicant with the financial resources necessary to complete the proposed construction . . . along with any related facilities . . . which are necessary to protect against harm to the public safety, convenience, or other adverse socioeconomic or environmental impact, as evidenced by a financing commitment from a lender or an investor . . . with adequate capitalization and resources to fulfill its commitment to build and complete the project;
>
> (3) Is proposed by an applicant who has negotiated in good faith to privately acquire sufficient property without the use of eminent domain;
>
> (4) Is proposed by an applicant who has filed a plat, as required by § 49-16A-64, and that plat sets forth the route of the road to be constructed or reconstructed, identifies each affected landowner, and specifies the location, along with construction methods and engineering specifications for all main lines, sidings, yards, bridges, crossings, safety devices, switches, signals, and maintenance facilities; and

(5) Provides that electric utilities, public utilities, telecommunication companies, and rural water systems have the right to the use of the right-of-way for the placement of underground facilities, without fee, subject to reasonable regulation as to location and placement.

Following extensive review, the Surface Transportation Board approved DM&E's application under the applicable federal statutes in January 2002. Regarding eminent domain, the Final Environmental Impact Statement stated:

Eminent domain proceedings are regulated by state law and not administered by the Board. In rail construction cases . . . the Board determines whether the construction is inconsistent with the public convenience and necessity under 49 U.S.C. 10901 but the applicant is responsible for the acquisition of land necessary for execution of the proposed project. . . . In the event that the proposed project is approved and DM&E cannot reach agreements with landowners, eminent domain proceedings may be pursued as an avenue of last resort.

DM&E then commenced this action to enjoin enforcement of Chapter 222. Though recognizing that federal law leaves the use of eminent domain by railroads to state law, the district court enjoined § 49-16A-75.3(1) as invalid under the dormant Commerce Clause because it intentionally discriminates against interstate commerce. The court also enjoined §§ 49-16A-75.3(2) and (4). Based on findings that DM&E could not obtain financing for the federally-approved Powder River Basin project under these oppressive restrictions, the court concluded that subsections (2) and (4) regulate interstate railroad operations in a manner that is conflict-preempted by the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. § 10501(b), and is invalid under the dormant Commerce Clause. The court enjoined § 49-16A-75.3(5) as violating the Takings Clause of the Fifth Amendment, made applicable to the States by the Fourteenth Amendment. However, based upon testimony that DM&E always negotiates in good faith with landowners, the court concluded that

§ 49-16A-75.3(3) does not conflict with federal law. The court rejected DM&E's severability argument and declined to enjoin enforcement of the remaining provisions of Chapter 222.

## II. The Eleventh Amendment Issue.

The Governor argues that South Dakota's sovereign immunity reflected in the Eleventh Amendment bars this federal court decree enjoining the Governor from acting in his official capacity  The district court rejected the argument, agreeing with DM&E that injunctive relief may be granted against the Governor under the exception to Eleventh Amendment immunity commonly referred to as the Ex parte Young doctrine. Under Ex parte Young, 209 U.S. 123, 159-60 (1908), the Eleventh Amendment bars damage relief against the States, but it does not prohibit "certain suits seeking declaratory and injunctive relief against state officers." Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 269 (1997). In Coeur d'Alene Tribe, a divided Supreme Court held that the Ex parte Young doctrine did not authorize injunctive relief against state officials that would "diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory." 521 U.S. at 282.

Relying primarily on Coeur d'Alene Tribe, the Governor argues that the Ex parte Young doctrine does not extend to this case because "regulation of eminent domain is as much a core sovereign interest of South Dakota as regulating submerged lands was for Idaho." But the comparison either proves too much or is unsound. On the one hand, the police power, too, is a "core sovereign interest," but Coeur d'Alene Tribe cannot apply to every suit for injunctive relief against a state official's exercise of the police power -- that would effectively overrule the Ex parte Young doctrine, despite the Court's express declaration to the contrary in Coeur d'Alene Tribe, 521 U.S. at 269. On the other hand, if the comparison is based on the fact that eminent domain is the power by which a State acquires ownership of lands, and state-owned

-5-

lands were at issue in Coeur d'Alene Tribe, the two cases are not comparable. This lawsuit does not involve lands that South Dakota *owns*, nor does it challenge the State's power to take land by eminent domain. Rather, as the district court explained, DM&E's claim turns on whether the State has used the statute delegating its eminent domain power to regulate and control a federally approved railroad project. 236 F. Supp. 2d at 1007. Thus, the injunction DM&E seeks is within the traditional purview of Ex parte Young because it seeks "to bring the State's regulatory scheme into compliance with federal law." Coeur d'Alene Tribe, 521 U.S. at 289 (O'Connor, J., concurring); see Duke Energy Trading & Mktg., L.L.C. v. Davis, 267 F.3d 1042, 1053-54 (9th Cir. 2001), cert. denied, 535 U.S. 1112 (2002).

The lead opinion in Coeur d'Alene Tribe reasoned that proper application of the Ex parte Young doctrine requires a case-by-case analysis that carefully considers whether a state forum is available to vindicate the federal interest, the nature of the federal rights to be vindicated, and the competing sovereignty interests of the State. 521 U.S. at 270-80. But seven Justices refused to join this portion of the opinion. More recently, in a case involving alleged conflict between federal and state regulation of the telecommunications industry, the Court unanimously reaffirmed its traditional articulation of the doctrine: "In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Md. Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645 (2002) (quotation and brackets omitted). We are bound to follow Verizon[2] and therefore affirm the district court's conclusion

---

[2]Three decisions from other circuits have relied in part on Coeur d'Alene Tribe in dismissing claims for equitable relief against state officials. But two were decided before Verizon, and the third was decided one month after Verizon and did not cite it. See Barton v. Summers, 293 F.3d 944, 951 (6th Cir. 2002); MacDonald v. Village of Northport, 164 F.3d 964, 972 (6th Cir. 1999); ANR Pipeline Co. v. LaFaver, 150 F.3d 1178, 1193 (10th Cir. 1998), cert. denied, 525 U.S. 1122 (1999).

that the Ex parte Young doctrine authorizes relief enjoining the Governor from enforcing those portions of Chapter 222 that violate or conflict with federal law.

### III.  The Tenth Amendment Issue.

The Governor next argues that the injunction exceeds the federal government's powers under the Commerce Clause and violates the Tenth Amendment as construed in the Supreme Court's recent "anti-commandeering" decisions, New York v. United States, 505 U.S. 144, 161 (1992), and Printz v. United States, 521 U.S. 898, 935 (1997).  These related contentions are without merit.  As for the first, the district court enjoined enforcement of state statutes on the grounds that they intentionally discriminate against interstate commerce, conflict with federal statutes regulating interstate commerce, or violate the Fifth Amendment's Takings Clause.  Those grounds are unquestionably within the proper powers of the federal government.  See, e.g., CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 661-64 (1993); The Shreveport Rate Cases, 234 U.S. 342, 351 (1914); City of Auburn v. United States, 154 F.3d 1025, 1029 (9th Cir. 1998), cert. denied, 527 U.S. 1022 (1999).  As the Governor has not appealed the merits of the district court's application of federal law, the argument that its injunction exceeds the federal government's limited powers must fail.

The anti-commandeering contention is similarly flawed.  The general principle is "that Congress cannot compel the States to enact or enforce a federal regulatory program."  Printz, 521 U.S. at 935, reaffirming New York, 505 U.S. at 161.  The doctrine limits the power of Congress to "commandeer" State resources to enforce federal law.  The doctrine explicitly does not affect "the power of federal *courts* to order state officials to comply with federal law" because "the Constitution plainly confers this authority on the federal courts."  New York, 505 U.S. at 179 (emphasis in the original).  In this case, the parties agree that the federal statutes in question leave South Dakota free to decide whether federally regulated railroads should be delegated the State's eminent domain power.  Thus, Congress has done no

commandeering. South Dakota chose to delegate its eminent domain authority, and the district court has enjoined those portions of the state law that conflict with or violate federal statutes or constitutional provisions, which are "the supreme Law of the Land." U.S. CONST., art. VI, cl. 2. Such an injunction does not violate the Tenth Amendment.

## IV. The Severability Issue.

Though it enjoined enforcement of subsections (1), (2), (4), and (5) of § 49-16A-75.3, the district court refused to enjoin subsection (3) as well as §§ 49-16A-75, -75.1, and -75.2 because these provisions do not conflict with federal law and are severable from the invalid provisions. DM&E appeals, arguing that the court erred by failing to enjoin §§ 49-16A-75 to -75.3 in their entirety because "the Legislature would not have enacted the statute without the offending portions." The issue of severability is one of state law. See Leavitt v. Jane L., 518 U.S. 137, 139 (1996).

We agree with the district court's resolution of this issue. Under South Dakota law, a court must "uphold the remaining sections of a statute if they can stand by themselves and if it appears that the legislature would have intended the remainder to take effect without the invalidated section." S.D. Educ. Ass'n v. Barnett, 582 N.W.2d 386, 394 (S.D. 1998) (quotation omitted). This rule applies whether or not the statute contains a severability clause. See City of Sioux Falls v. Sioux Falls Firefighters, Local 814, 234 N.W.2d 35, 38 (1975). The form of the statute is not determinative; the issue turns on whether its provisions "are essentially and inseparably connected in substance." State v. Becker, 51 N.W. 1018, 1022 (S.D. 1892), overruled on other grounds, State v. Phipps, 318 N.W.2d 128, 132 (S.D. 1982). DM&E bears the burden of showing that the legislature would not have enacted the statute without the invalid portions. Barnett, 582 N.W.2d at 394.

In this case, Chapter 222 amended the prior eminent domain statute in the following respects:

(1) by requiring a railroad seeking to exercise the delegated eminent domain power to obtain a determination by the Governor or the Transportation Commission that the exercise would be for a public use consistent with public necessity; previously, the railroad simply filed a petition with the circuit court for the county where the land is located; compare § 49-16A-75, with § 21-35-1;

(2) by granting rulemaking authority to the Commission, § 49-16A-75.1;

(3) by placing on the railroad the burden to prove "public use consistent with public necessity," § 49-16A-75.2; previously, the railroad's finding of necessity was binding "unless based upon fraud, bad faith or abuse of discretion," § 21-35-10.1;

(4) by requiring the railroad to negotiate in good faith to acquire sufficient property before proposing the use of eminent domain, § 49-16A-75.5(3); and

(5) by imposing the conditions in § 49-16A-75.3(1), (2), (4), and (5) that the district court held to be contrary to federal law.

DM&E concedes on appeal that the first four changes do not conflict with federal law. These provisions function logically on their own. They effect significant changes in eminent domain law and procedure, giving the State greater control over the delegation of its eminent domain power and providing increased protection to affected landowners. These changes are clearly within the State's sovereign powers. Although the invalid provisions were significant -- indeed, too significant in their impact on interstate commerce -- DM&E has failed to show that the South Dakota Legislature would not have enacted the distinct substantive changes accomplished by the remaining provisions of §§ 49-16A-75 to -75.3 without the offending provisions.

As the district court noted, "the statute has significant meaning and purpose even without the offending portions." Dakota, Minn., & E. R.R., 236 F. Supp. 2d at 1031.[3]

## V. A Subject Matter Jurisdiction Issue.

Section 49-16A-75.3(5) provides that a railroad's exercise of eminent domain is not a "public use consistent with public necessity" unless it provides designated entities "the right to the use of the [railroad's] right-of-way for the placement of underground facilities, without fee, subject to reasonable regulation as to location and placement." The district court enjoined enforcement of this provision, concluding that it is an unconstitutional "regulatory taking" because the Governor "has failed to

---

[3]There is another problem lurking in DM&E's contention that §§ 49-16A-75 to -75.3 are non-severable. DM&E apparently assumes that, if those statutes were enjoined in their entirety, DM&E could exercise the eminent domain power delegated under prior § 49-16A-75. The general rule is that prior law is revived when an amending statute is invalidated in toto. See Knowles v. United States, 544 N.W.2d 183, 204-05 (S.D. 1996). But there is authority, cited favorably in Knowles, suggesting that the prior statute does not revive if the legislature intended otherwise. See 1A SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 22:37 (6th ed. 2002). That issue of legislative intent has not been addressed, much less resolved in DM&E's favor. If DM&E attempted to avoid the issue by arguing that *federal* law mandates an injunction reviving the prior state law, then it would be arguing that Congress has compelled the State to delegate its eminent domain power to federally regulated railroads, which would raise a serious Tenth Amendment anti-commandeering issue. On the other hand, if DM&E argued that the injunction it seeks need not revive prior law because it leaves in place the first clause of amended § 49-16A-75, the portion that reenacted the prior statute, then DM&E would be conceding that at least part of §§ 49-16A-75 to -75.3 may be severed from the invalid provisions. As we conclude that the valid portions of Chapter 222 are severable under state law, we need not resolve these additional issues.

-10-

demonstrate that such a free easement is roughly proportional to [the] impact of the proposed [DM&E] project." 236 F. Supp. 2d at 1029.

The Takings Clause prohibits the taking of "private property . . . for public use, without just compensation." U.S. CONST. amend. V. Although a regulatory taking may be challenged in federal court in an action under 42 U.S.C. § 1983, the claim must be ripe before the federal court may consider it. The issue of ripeness, which has both Article III and prudential components, is one of subject matter jurisdiction. See McKenzie v. City of White Hall, 112 F.3d 313, 316-17 (8th Cir. 1997). Thus, we must consider it even though the parties did not raise it on appeal. See Burris v. City of Little Rock, 941 F.2d 717, 721 (8th Cir. 1991).

A Takings Clause claim must be ripe in two respects. First, the issue of whether there has been or will be a taking must be ripe for federal court review. As the Supreme Court expressed it, "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 186 (1985). Second, because the Constitution only prohibits takings without just compensation, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." Williamson County, 473 U.S. at 195.

In this case, the district court discussed the general question of ripeness in its order granting DM&E a preliminary injunction. But this order neither discussed the Takings Clause claim nor preliminarily enjoined enforcement of § 49-16A-75.3(5). Rather, the Takings Clause challenge to subsection (5) was first addressed in the court's order granting a permanent injunction. That order made only a passing reference to ripeness, see 236 F. Supp. 2d at 1029, and did not cite or discuss

-11-

Williamson County or its progeny, such as Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725 (1997).[4] As the issue is jurisdictional, it requires more careful analysis, even though ignored by the parties.

We conclude that DM&E's challenge to subsection (5) raises serious issues under both aspects of the ripeness analysis. First, we are not certain that the statute mandates a taking of railroad property. Subsection (5) provides that other entities must "have the right to the use of the right-of-way . . . without fee." No doubt that entails the grant of easements of some value, but who will grant the easements and who will pay for them? If the railroad exercising eminent domain need not pay the landowner for the value of the future easements because the railroad is acquiring something less than a fee simple absolute property interest, then the withheld easements are never "taken" from the railroad. Someone else -- the State, the selling landowner, or the easement beneficiaries -- will pay some value for them. Second, if the railroad exercising eminent domain must pay the landowner full value for the property and then grant free easements to the entities named in subsection (5), the end result appears to be a permanent physical taking of a property interest. But the district court did not address whether the railroad would have a right to recover just compensation under the South Dakota eminent domain laws. See Wisconsin Cent. Ltd. v. Public Serv. Comm'n, 95 F.3d 1359, 1368-69 (7th Cir. 1996).

In these circumstances, we have considerable doubt the Takings Clause claim is ripe. But the issue is complex and has not been addressed by the parties. Accordingly, we will vacate the injunction against enforcing § 49-16A-75.3(5) and remand this aspect of the case to the district court for whatever further proceedings it deems appropriate.

---

[4]Most of the cases relied upon by the district court in its takings analysis, such as Dolan v. City of Tigard, 512 U.S. 374 (1994), and Nollan v. California Coastal Comm'n, 483 U.S. 825 (1987), did not discuss ripeness because they were appeals from final state court decisions holding that no taking had occurred.

## VI.  Conclusion.

For the foregoing reasons, the order of the district court enjoining enforcement of §§ 49-16A-75.3(1), (2), and (4) is modified in accordance with footnote 1 of this opinion and, as so modified, is affirmed.  The order enjoining enforcement of § 49-16A-75.3(5) is vacated, and that issue is remanded to the district court.  In all other respects, the district court's order dated December 6, 2002, is affirmed.

_____