BANNUM, INC., Appellant,

v.

The CITY OF ST. CHARLES, MO., Appellee.

No. 92–3686.

United States Court of Appeals, Eighth Circuit.

Submitted May 11, 1993.

Decided Aug. 5, 1993.

Scott T. Wendelsdorf, Louisville, KY, argued (P. Terence Crebs, St. Louis, MO, on brief), for appellant.

Robert J. Krehbiel, St. Louis, MO, argued for appellee.

Before BOWMAN, Circuit Judge, HENLEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

Bannum, Inc., appeals from the district court's [1] grant of summary judgment in its 42 U.S.C. § 1983 action in favor of the defendant, the City of St. Charles (the City). On appeal, Bannum claims the City violated Bannum's equal protection rights under its former zoning scheme by prohibiting community treatment centers (CTCs) and under its amended zoning scheme by allowing CTCs only as conditional uses. We affirm.

## I. BACKGROUND

Bannum is a company in the business of operating CTCs [2] throughout the United States pursuant to contracts with the Federal Bureau of Prisons (BOP). CTCs are halfway houses for convicted criminals in the last stage of their sentences before release. CTC participants work in the community during the day and reside in a supervised residential facility at night. In the past, Bannum has located some CTCs in motels, using the motel rooms both to house CTC participants and for offices to provide the participants with counseling and other support services.

1. The Honorable Clyde S. Cahill, Senior United States District Judge for the Eastern District of Missouri.

2. CTCs are also known as community correction centers.

In 1987, Bannum received a request from the BOP to submit a proposal for a CTC in the St. Louis area. After contacting hotels and motels in the area, Bannum chose the Town House Inn in the City as a potential CTC site. Bannum contacted the City police department to inform them it intended to open a CTC in the area, and contacted the City development department regarding zoning. One of the City's employees sent Bannum a letter stating that as she understood the proposed use, it would be permitted as a matter of right in the City's C2 district.[3] Bannum received nothing else from the City regarding whether the CTC was a permitted land use in the City. On November 7, 1988, Bannum was awarded the CTC contract for the St. Louis area.

The City has a permissive zoning scheme; any use not expressly permitted by the zoning ordinances is prohibited. *See* Rev.Ords. of the City of St. Charles, Mo., ch. 30, art. I, § 30–14; *Wintercreek Apartments v. City of St. Peters*, 682 F.Supp. 989, 996 (E.D.Mo. 1988). Among the uses permitted as a matter of right in the C2 General Business District was the use as "[h]otels, motels or motor lodges."[4] Rev.Ords. of the City of St. Charles, Mo., ch. 30, art. II, § 30–34. The ordinance also listed conditional uses for the C2 district. *See id.* Conditional uses are

permitted if approved by the board of adjustment. CTCs or half-way houses were not expressly permitted in the City's zoning ordinances for any district as either a permitted use or a conditional use.

Bannum's proposed use of the Town House Inn was made public in late November 1988, and some opposition to it was raised. In December, the City's mayor wrote the BOP regarding its award of the contract to Bannum. The BOP wrote back on February 6, 1989, stating that because the City was not willing to provide documentation allowing Bannum to operate the CTC as specified in the contract, it was authorizing Bannum to relocate the CTC to another area.

On February 23, 1989, the City amended the zoning ordinances by adding half-way houses to the list of conditional uses in the C2 district. The City also enacted another ordinance which added to the ordinances' definitions of "half-way house"[5] and "transient,"[6] and substituted a new definition of "motel (motor court, tourist court or motor lodge)."[7] Bannum's proposed CTC falls within the new definition of half-way house, and thus is allowed under the amended ordinances as a conditional use in the C2 district. Bannum did not apply for a conditional permit to operate its CTC.

---

3. The letter which the city employee sent Bannum stated: "The Town House Inn ... is zoned C2, General Business District, which allows hotels and other transient lodging places, as well as office uses. As I understand your proposed use of this building, persons will be lodging there as transients, will not cook on these premises and will have support given through office uses. All of these uses would be permitted under the C2 zoning district."

4. Motel (motor court, tourist court or motor lodge) was defined as:
   A building or group of buildings containing guest rooms or dwelling units, with a garage or parking space conveniently located on the lot, and designed, used or intended wholly or in part for the accommodation of automobile transients. A motel may include restaurants, tavern or club rooms, public banquet halls, ballrooms and meeting rooms as subordinate uses.
   Rev.Ords. of the City of St. Charles, Mo., ch. 30, art. I, § 30–5.

5. The term "half-way house," under the amended zoning ordinances, is defined as "[a] facility

for rehabilitation of persons who are prisoners, former prisoners, or juvenile offenders, in a controlled environment with supervision, treatment or counseling provided on-site on an interim basis after referral from a public agency or institutional facility." Rev.Ords. of the City of St. Charles, Mo., ch. 30, art. I, § 30–5.

6. "Transient" is defined as "[a]ny person who rents and occupies a guest room for a period of less than thirty-one days." Rev.Ords. of the City of St. Charles, Mo., ch. 30, art. I, § 30–5.

7. The new definition for "motel (motor court, tourist court or motor lodge)" is "[a] building or group of buildings containing guest rooms, with a garage or parking spaces conveniently located on a lot, in which lodging is offered to the public for compensation, and is provided to transients. A motel may include restaurants, taverns or club rooms, public banquet halls, ballrooms and meeting rooms as subordinate uses." Rev.Ords. of the City of St. Charles, Mo., ch. 30, art. I, § 30–5.

The BOP's contract with Bannum was conditioned on the proposed CTC being in compliance with local zoning law. Because the City would not provide the BOP with documentation that the CTC was a permitted use under the zoning ordinances, the BOP notified Bannum that its contract to operate the CTC was terminated for convenience of the government.

Bannum brought a claim against the City under 42 U.S.C. § 1983, claiming, inter alia, the City violated its rights under the Equal Protection Clause. The district court granted the City's motion for summary judgment on all grounds. Bannum appeals the grant of summary judgment only on the claim that its equal protection rights were violated.

## II. DISCUSSION

### A. Standard of Review

We review the district court's grant of summary judgment de novo, *United States ex rel. Glass v. Medtronic, Inc.*, 957 F.2d 605, 607 (8th Cir.1992), and we apply the same standards used by the district court, *Thelma D. by Delores A. v. Board of Educ.*, 934 F.2d 929, 932 (8th Cir.1991). We affirm only when the record shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Osborn v. E.F. Hutton & Co.*, 853 F.2d 616, 618 (8th Cir.1988).

### B. Former Zoning Ordinance

Bannum argues that the former zoning ordinance, on its face and as applied, violated the Equal Protection Clause by prohibiting CTCs while other similar and identical uses of property were permitted as a matter of right. Bannum also claims the district court erred by basing its summary judgment decision solely on the finding that CTCs are not motels or hotels as defined by the former zoning ordinances.

■ The district court's decision was consistent with the primary argument Bannum presented below—that its proposed use of the Town House Inn was consistent with the definition of "motel" in the city zoning code, and thus was a permitted use. However, Bannum has reversed its position on appeal.

It now concedes that its proposed use as a CTC was not permitted by the former zoning ordinances, and argues that this prohibition violates the Equal Protection Clause. We have discretion to address this new theory on appeal because it involves a pure question of law, *see Souder v. Owens–Corning Fiberglas Corp.*, 939 F.2d 647, 650 n. 3 (8th Cir.1991), and we hold Bannum's new theory fails as well.

■ Both parties concede that the City's zoning ordinances do not involve suspect classifications or impinge on fundamental rights. Therefore, we examine the ordinances under the rational basis test, and must uphold them if they are rationally related to a legitimate governmental purpose. *Hodel v. Indiana*, 452 U.S. 314, 331, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981). "[S]uch legislation carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Id.* at 331–32, 101 S.Ct. at 2387.

■ Showing the zoning ordinances were arbitrary and irrational is a "heavy burden," *id.* at 332, 101 S.Ct. at 2387, and Bannum has not met this burden. The permissive zoning scheme which did not list CTCs as a permitted use is not in itself arbitrary or irrational. The City could not conceive of and address every possible land use; listing permitted uses and addressing new proposed uses one step at a time is appropriate. *See McDonald v. Board of Election Comm'rs of Chicago*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969) ("[A] legislature traditionally has been allowed to take reform 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'") (citation omitted). We also cannot say the City's failure to include CTCs in the original ordinances was arbitrary or irrational; many possible land uses are not listed in the ordinances. Furthermore, when the proposed use for a CTC was brought to the City's attention by Bannum, the City did address this use. It then amended the zoning ordinances to allow halfway houses, which would include CTCs, as a conditional use.

We cannot say that the City's failure to address the use of land by CTCs or half-houses in the original ordinances was arbitrary or irrational. Therefore, Bannum's claim that failure to provide for CTCs in the original ordinances violated its equal protection rights fails.

### C. Amended Zoning Ordinance

Bannum also contends the amended zoning ordinances violate the Equal Protection Clause both facially and as applied because Bannum is required to apply for a conditional use permit to operate a CTC. Bannum contends that other "similar and identical uses of property" are permitted as a matter of right and may operate without a conditional use permit. These uses which Bannum claims are similar and identical include hotels, convalescent homes, hospitals, apartment buildings, and multiple family housing. Because these uses do not need to apply for a conditional use permit, Bannum claims, imposing this requirement on half-way houses, which house prisoners, ex-prisoners, and juvenile offenders,[8] is arbitrary and irrational, violating Bannum's equal protection rights.

Again, because no suspect class or fundamental right is involved, we review Bannum's claim under the rational basis test, *see Hodel,* 452 U.S. at 331, 101 S.Ct. at 2386–87, and uphold the ordinance if it "bears a rational relation to a legitimate government objective," *Kadrmas v. Dickinson Pub. Sch.,* 487 U.S. 450, 461–62, 108 S.Ct. 2481, 2489–90, 101 L.Ed.2d 399 (1988). The amended ordinance also carries a presumption of rationality which Bannum can overcome only "by a clear showing of arbitrariness and irrationality." *Hodel,* 452 U.S. at 331–32, 101 S.Ct. at 2387. "[W]e will not overturn such [an ordinance] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the

[City's] actions were irrational." *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979).

We first address whether the amended ordinances which list half-way houses as conditional uses facially violate the Equal Protection Clause. The record does not contain articulated reasons from the city council for amending the zoning ordinances to include half-way houses as a conditional use. However, we need inquire only whether "any state of facts reasonably may be conceived to justify" the classification of half-way houses as conditional uses. *Holt Civic Club v. Tuscaloosa,* 439 U.S. 60, 74, 99 S.Ct. 383, 392, 58 L.Ed.2d 292 (1978) (citation omitted). Bannum carries the burden of convincing us that the treatment given half-way houses under the zoning ordinances is "so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance,* 440 U.S. at 97, 99 S.Ct. at 943.

Half-way houses, as defined by the amended ordinance, would include facilities for any prisoner, former prisoner, or juvenile offender. Persons who had been convicted of any state or federal crime could be placed in a half-way house. This population could include persons who had been convicted of violent crimes such as second degree murder or rape. If half-way houses were allowed as permitted uses, the City would have no control over where within a given district a half-way house was located. It is easy to envision many situations which the City would want to prevent, such as locating near a school a half-way house containing persons who had been convicted of dealing in drugs or of child molestation. Because of legitimate concerns for public welfare, the City could rationally want to control where within a district a half-way house could be located. It can accomplish this legitimate purpose by requiring a conditional permit for operation of a half-way house.

---

**8.** Bannum apparently rests its claim that a CTC is similar and identical to hotels, convalescent homes, apartment buildings, and multiple family housing on the common factor that they are all used for multiple or temporary housing. However, Bannum regards as unimportant a key difference: CTCs are intended to house a certain pop-

ulation—convicted prisoners who are serving the final portion of their sentence. Additionally, we note that not all multiple housing uses are permitted uses, as the City also allows boarding and rooming houses only as conditional uses. Rev. Ords., ch. 30, art. III, § 30–28(d)(2).

■ Bannum argues that under *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), negative attitudes and fear of offenders in the last stage before release are not permissible bases for treating a CTC or halfway house differently from apartment houses and other multiple person uses of property. The *Cleburne* Court held that "requiring [a] permit [for a home for the mentally retarded] appears to us to rest on an irrational prejudice against the mentally retarded...." *Id.* at 450, 105 S.Ct. at 3260. Among the concerns which the Court considered to be irrational bases for requiring a permit were the citizens' negative attitudes and fears of the mentally retarded, the number of persons which the home would contain, and population congestion. *Id.* at 448, 105 S.Ct. at 3258.

However, *Cleburne* is inapposite.[9] The concerns the City of Cleburne relied on to require a permit would be irrational bases as applied to any home for the mentally retarded, *see id.* at 448–50, 105 S.Ct. at 3258–60, and the Court concluded that the permit requirement was really based on irrational prejudice. Here, the classification in the amended ordinance is addressed to half-way houses which serve any prisoner, ex-prisoner, or juvenile offender. The City could rationally believe that some groups in this classification could pose a threat to the public welfare. Such concerns are not based on irrational prejudice, but rather on a realistic view that some members of these groups could pose a threat in some locations. It is not irrational for the City to believe that recidivism could be a problem with some persons served by half-way houses. This is a legitimate concern which can be addressed on a case-by-case basis through application for conditional permits.

The City contends that Bannum's as-applied challenge to the amended ordinance is not ripe for review because Bannum never applied for a conditional use permit. However, Bannum's as-applied challenge is not based on a claim that it was denied a permit to operate a CTC. It is challenging the scheme of the ordinance itself, and contesting the fact that the ordinance, as applied to Bannum, requires that it must apply for a conditional use permit. Thus, the question before us on Bannum's as-applied challenge is only whether Bannum's equal protection rights were violated by the requirement that it must apply for a conditional permit before it may operate a CTC. In other words, we must address whether including Bannum's proposed CTC in the classification of half-way houses which are conditional uses is rationally related to a legitimate governmental goal.

■ Bannum claims that there is no evidence in the record to establish that the City needs to protect the public welfare by monitoring where CTCs are located. It contends an evidentiary trial is needed to determine whether there is a rational relationship between any legitimate governmental interest and the requirement that CTCs apply for a conditional permit. However, no evidentiary hearing is needed; this court can determine whether the ordinance is a rational method of serving a legitimate goal without such a hearing. *See Gregory v. Ashcroft,* 898 F.2d 598, 605 (8th Cir.1990), *aff'd,* — U.S. —, —, 111 S.Ct. 2395, 2407, 115 L.Ed.2d 410 (1991).

■ Bannum claims its proposed CTC would house only nonviolent, white-collar of-

---

9. Bannum correctly pointed out that the Eleventh Circuit stated that *Cleburne* was analogous to another equal protection claim Bannum brought regarding a CTC. *See Bannum, Inc. v. City of Fort Lauderdale,* 901 F.2d 989, 999 n. 30 (11th Cir.1990). The Eleventh Circuit, however, was dealing with a situation in which Bannum had successfully operated a CTC in Fort Lauderdale for close to a year, and then was denied a permit to operate. The court was addressing the claim that this particular CTC, which had an established track record, had been denied equal protection of the laws when it was denied the permit. The reference to *Cleburne* only suggests that the Eleventh Circuit was stating that mere negative attitudes or fear, by themselves, are insufficient bases to deny the permit for this CTC. *See id.* We do not disagree. However, in this case, Bannum is claiming it should not have to apply for a permit at all. If Bannum does apply, it would then have an opportunity to state its claim to the City that the group of persons it would house in that particular CTC are not a threat in that particular location. If denied a permit, *Cleburne* would be relevant to an inquiry of the bases for that denial.

fenders,[10] and claims these criminals pose no threat to the public welfare. Thus, Bannum argues, it is irrational for the City to require that it apply for a conditional permit for this CTC. However, the City does not violate the Equal Protection Clause just because the classifications contained in its ordinances are not perfect. *See Gregory v. Ashcroft,* —— U.S. ——, ——, 111 S.Ct. 2395, 2407, 115 L.Ed.2d 410 (1991). The zoning ordinance was not written to apply only to Bannum's CTC; it was written to have broad application to any half-way houses which house prisoners, former prisoners, or juvenile offenders. It is not arbitrary or irrational for the City to create this broad category, and then draw fine lines between different types of half-way houses when an application for a permit is submitted. After a person wishing to operate a half-way house applies for a permit, the City will have the opportunity to examine at length what type of offenders will be housed at that half-way house and consider whether any threat to the public welfare exists at that particular location.

## III.  CONCLUSION

For the reasons discussed above, the former and the amended zoning ordinances do not violate the Equal Protection Clause. There are no genuine issues of material fact and the City is entitled to judgment as a matter of law. We affirm the district court's grant of summary judgment.

---

**10.** Bannum admits that the "non-violent white collar criminals" served by its CTC would include "the big money behind [trafficking] drugs

... the people with the business suits, and the yachts...." Lowry Dep. at 127 (Feb. 27, 1991).